Filing # 71594971 E-Filed 05/15/2018 01:48:55 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.: 16-2016-CA-004048-XXXX-MA
DIVISION: CV-C

**BELINDA S. KIRK,**

      Plaintiff,

v.

**ALLERGAN SALES, LLC,**
**a foreign limited liability company,**

      Defendants.

_____/

## COMPLAINT

The Plaintiff, **BELINDA S. KIRK**, sues the Defendants, **ALLERGAN SALES, LLC**, a

foreign limited liability company, and allege the following:

### GENERAL ALLEGATIONS

1.    This is an action for damages in excess of $15,000, exclusive of attorney's fees,

costs, and interest.

2.    All conditions precedent to the filing of this action have been performed or have

occurred.

3.    At all times material hereto, the Plaintiff, **BELINDA S. KIRK** (hereinafter "Ms.

Kirk"), was and is a resident of, and permanently domiciled in, Duval County, Florida.

4.    All medical care and treatment rendered to Ms. Kirk, upon which the claims set

forth herein are based took place in Jacksonville, Duval County, Florida.

ACCEPTED: DUVAL COUNTY, RONNIE FUSSELL, CLERK, 05/15/2018 01:57:53 PM

5.     The Defendant **ALLERGAN SALES, LLC** is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

6.     The Defendant **ALLERGAN SALES, LLC** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit: researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

7.     The Defendant **ALLERGAN SALES, LLC** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

8.     The Defendants **ALLERGAN SALES, LLC**, are hereinafter collectively referred to as "Allergan."

## FACTUAL ALLEGATIONS

### Allergan's Natrelle Saline Filled Breast Implants

9.     In 1962, two Texas plastic surgeons performed the first breast augmentation surgery using silicone gel filled implants.  In 1963, Dow Corning began manufacturing silicone gel filled breast implants based upon the Texas doctors' designs.

10.     Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants.  In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

2

11.    In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed. The new company's breast implants were still labeled McGhan breast implants. By this time the company was one of the largest breast implant manufacturers in the world.

12.    As a result of emerging safety concerns, in 1988 the United States Food and Drug Administration (FDA) re-classified silicone gel filled breast implants as Class III medical devices, which then required breast implant manufacturers to submit Pre-Market Approval (PMA) applications to the FDA to prove by valid scientific data that their respective implants were safe and effective.

13.    After reviewing the PMA applications of the different silicone breast implant manufacturers (including those of Inamed/McGhan), in 1992 the FDA prohibited the sale of silicone breast implants.

14.    In 1994, a $4 billion class action lawsuit over silicone filled breast implants was settled. Inamed contributed approximately $32,000,000 toward the settlement.

15.    In 1998, Inamed removed and replaced Donald K. McGhan from his position as chairman and chief executive of the company.

16.    On November 16, 1999, Inamed filed a PMA for the "McGhan Medical RTV Saline-Filled Breast Implant," later known as the "Natrelle Saline-Filled Breast Implant." On May 10, 2000, the FDA issued a letter approving the PMA.

17.    In March of 2006, Inamed merged with Allergan, Inc., a company that makes products for eye care, neuroscience and dermatology, including its best known product, Botox, the injectable wrinkle treatment. Afterward, McGhan Natrelle Saline Filled Breast Implants became

3

known as "Allergan Natrelle Saline Filled Breast Implants."

18.     On November 17, 2006, the FDA approved PMA's from both Allergan and Mentor (Allergan's main U.S. competitor in the design and manufacture of breast implants) for new silicone filled breast implants.

19.     On February 20, 2013, the FDA approved Allergan, Inc.'s PMA for the Natrelle 410, anatomically shaped highly cohesive silicone gel-filled breast implants, a type of breast implants that are commonly referred to as "gummy bear" implants. The new implants were softer, more cohesive, and more anatomically shaped than saline filled implants.

20.     In the last several years, silicone gel-filled implants have become the most commonly used types of breast implants in the U.S.

21.     With all Natrelle breast implants, Inamed/Allergan included its "ConfidencePlus Warranty." According to the ConfidencePlus warranty literature provided by Allergan, the warranty program applied to all FDA-approved Natrelle breast implants, provided the implants were used:

- As intended by appropriately qualified and licensed surgeons, in accordance with current and accepted plastic surgery techniques
- In accordance with the current *Natrelle* Breast Implant Directions for Use, found at www.allergan.com/labeling/usa.htm.

However, the warranty only applied to cases of:

- Loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention
- Capsular contracture (Baker Grade III/IV) with *Natrelle* Gel implants that requires surgical intervention

22.     Under Allergan's *ConfidencePlus Warranty Matrix*, the Standard warranty comes with Natrelle implants free of additional cost, while the Premier warranty cost an additional $100 until 2014, and $200 thereafter; both warranties have terms of coverage of 10 years. The Standard

warranty provides for a lifetime replacement of the ruptured implant, replacement of the contralateral implant (for 10 years)[1], and $1,200 for the cost of replacement/revision surgery. The Premier warranty provides for lifetime replacement of both the ruptured and contralateral implants, plus $2,400 for the cost of replacement/revision surgery.

### Loren Z. and Mark A. Clayman

23.     Loren Z. Clayman was first licensed as a medical doctor in the State of Florida on January 10, 1975. On December 31, 1976, he completed a residency in plastic surgery, and he began practicing plastic surgery soon afterward in Jacksonville, Florida. On October 2, 1978, he filed articles of incorporation for Loren Z. Clayman, M.D., PA (hereinafter "Clayman PA"), with himself listed as both President and the Registered Agent of the new corporation.

24.     Loren Z. Clayman began performing breast augmentation surgeries as part of his plastic surgery practice. During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

25.     After the FDA prohibited the sale of most silicone implants in 1992, Loren Z. Clayman began using saline filled implants almost exclusively.[2]

26.     By 2000, Loren Z. Clayman purchased at least a portion of the saline filled breast implants he used in augmentation procedures from Inamed/McGhan (later Allergan). The majority (if not all) of saline filled breast implants he purchased from Inamed/McGhan were Natrelle saline filled breast implants.

---

[1]     At first, only Natrelle Style 163 saline filled implants had lifetime replacement for contralateral breast implants; other Natrelle saline filled implants had only a 10 year warranty for contralateral implants. Beginning June 1, 2009, the Standard warranty was changed to provide for the lifetime replacement of contralateral breast implants for all Natrelle saline filled implants.

[2]     Silicone filled breast implants could only be used for patients participating in ongoing medical studies, although it is unknown whether any of Loren Z. Clayman's patients participated in the studies.

27.    Before Ms. Kirk first consulted with Clayman PA regarding breast augmentation in August 2009, Loren Z. Clayman began making a higher than average number of warranty claims for patients with saline filled implants.  In the vast majority of these claims, Loren Z. Clayman and/or Clayman PA alleged that one or more saline implants spontaneously ruptured/deflated through no fault of the patient or himself.  Furthermore, Loren Z. Clayman and/or Clayman PA began making multiple, successive warranty claims for many of his/their patients.  This practice of Loren Z. Clayman and/or Clayman PA continued during the course of treatment of Ms. Kirk.

28.    Even after the FDA once again permitted the sale of silicone filled breast implants in 2006, Loren Z. Clayman and/or Clayman PA continued using saline filled breast implants almost exclusively for breast augmentation procedures.

29.    After June 30, 2008, Loren Z. Clayman's son, Mark A. Clayman, joined Clayman PA and began practicing plastic surgery, including performing breast augmentation procedures.  For patients who received saline filled breast implants, Mark A. Clayman through Clayman PA also began making a higher than average number of warranty claims in which he alleged spontaneous ruptures/deflations through no fault of the patient or him.  Likewise, in many instances, Mark A. Clayman through Clayman PA made multiple, successive warranty claims for patients, and he rarely, if ever, used silicone filled implants for breast augmentation procedures.

30.    **Between 2001 and 2015, Clayman PA made warranty claims to Allergan for more than 5,516 pairs of Natrelle saline filled breast implants.**

31.    According to Allergan's follow up studies for Natrelle saline filled implants, the rate of spontaneous deflations is approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year.

32.    Pursuant to 21 C.F.R. §§ 814.80 and 814.82, Allergan has a continuing obligation to evaluate the "safety, effectiveness, and reliability" of medical devices such as Allergan Natrelle saline filled breast implants.   In accordance with these requirements, Allergan performs a *"Laboratory Analysis"* of each returned breast implant to determine the cause of an alleged rupture/deflation, after which a report is generated and maintained.  For the overwhelming majority of saline filled breast implants returned by Clayman PA to Allergan, Allergan found no identifiable causes for the claimed spontaneous ruptures/deflations.

33.    Nevertheless, to the best of the undersigned's knowledge and belief, Allergan paid every one of Clayman PA's warranty claims between 2001 and 2015.

### BELINDA S. KIRK

40.    Ms. Belinda S. Kirk initially sought a consultation for breast augmentation from Loren Z. Clayman's office on August 20, 2009.  She told Loren Z. Clayman that her breasts were saggy and that she wanted them larger and lifted up.  She was not sure what breast size that wanted. Loren Z. Clayman performed a brief exam and told her that she should have an incision at the areola and that, if necessary, he could do an internal lift so she wouldn't have awful scars.  Loren Z. Clayman then showed her pictures of older women getting breast lifts with significant scarring problems to dissuade her from getting a mastopexy.  Ms. Kirk also asked about liposuction, a tummy tuck and a face peal.  However, her biggest concern was a breast augmentation, other options were for the future.

41.    The only notation for the initial visit was, "new patient consultation for augmentation, mammoplasty-areola and abdomen laser skin tightening.  Sch augmentation 9/25/2009."  There is was a separate surgery cost estimate form indicating a proposal to perform an augmentation mammoplasty areola for $3,000, plus an operating room charge of $750.

7

42.    There are no other details of the initial visit given.  Specifically, there is no record of a discussion with Ms. Kirk regarding her objectives, the possible alternatives and counseling with regard to her condition.  The medical records also failed to document any detailed description of her current complaints and desired goals.  There is no documented physical examination including dimensional assessment of Ms. Kirk's breasts, nor is there discussion of possible approaches, type or size of implants to be used, or how he intended to address her concerns.

43.    Unbeknownst to Ms. Kirk, Loren Z. Clayman, Mark A. Clayman, and Clayman PA had a specific financial incentive to push saline implants on their patients, including Ms. Kirk, even when the patient specifically expressed a desire for silicone implants or was a candidate for silicone implants.  Loren Z. Clayman, Mark A. Clayman, and Clayman PA had engaged in a scheme with Allergan, the manufacturer of the saline implants, that they could claim a defect in the saline implants and replace them for their direct financial benefit when no such defect existed. Moreover, Loren Z. Clayman and/or Mark A. Clayman would claim defect of the saline implants and replace them in order to cover up his inadequate surgical skills or haste in performing surgeries on his patients.

44.    After the consultation with Loren Z. Clayman, Ms. Kirk was unsure about his recommendations and sought a second opinion from another plastic surgeon.  The other plastic surgeon suggested that she did not really need breast augmentation but that he would perform it if she insisted.  His price was much higher than Loren Z. Clayman and so she returned to Clayman, P.A.

45.    When Belinda S. Kirk returned to Clayman, P.A. on March 9, 2010, she was seen this time by Mark A. Clayman.  There was no patient questionnaire and no direct indication of the patient's goals or objectives.  Mark A. Clayman recorded the following note:

> Re-eval. Breast & abd. contour plus stretch marks left > right side aware that may worsen after suction, but not enough skin for removal. Concerned over skin tone face wants something stronger than 99% glycolic; discussed tca 35%, as well as dourdine assoc. with ped. PT aware, questions answered. Also would like imf scar for breast aug.

Mark A. Clayman told he that she did not need any type of separate breast lift.

46.     There are no other details of the Mark 9, 2010 visit with Mark A. Clayman. Specifically, there is no real indication of a discussion with her regarding her goals and objectives regarding her breasts. There is no documented physical examination including dimensional assessment of Ms. Kirk's breasts, nor is there discussion of type or size of implants to be used. Ms. Kirk was still unsure of what she wanted and did not scheduled breast surgery at that time.

47.     Belinda S. Kirk returned to see Mark A. Clayman again on December 9, 2010. There was no patient questionnaire and no real description of the patient's goals or objectives. She told Mark A. Clayman that she was ready to proceed and had brought pictures with her regarding her desires. Mark A. Clayman, after telling her the last time that she could have the implants placed underneath the breast, now told her that she needed to have an areola incision for placement of the breast implants. He assured her that this is what she "definitely needed" and that the scar would be unnoticeable. She specifically requested only a moderate increase to the size of her breasts.

48.     Belinda S. Kirk returned to Mark A. Clayman's office for surgery on December 9, 2010. She specifically expressed her goals as to have more fullness and to have her breasts lifted. She also noted that they sagged and wanted to be a size D or DD. There is no indication in Mark A. Clayman's chart that he recognized these goals and objectives. There is no documented physical examination prior to the surgery, specifically no documented dimensional assessment of

9

Ms. Kirk's breasts nor any physical findings whatsoever. The History and Physical form does not contain a single mark that purports to have been made by Mark A. Clayman.

49.     The single preoperative photograph taken of Ms. Kirk on the date of surgery depicts significant ptosis (sagging) together with volumetric and positional asymmetry.

50.     On April 29, 2011, Mark A. Clayman cut into the breasts at the intra-areolar border and dissected down to the pectoralis muscle. He then recorded that the muscle was elevated and released and an appropriate pocket developed. He then recorded that the, "implants were inserted and inflated." Mark A. Clayman inserted Allergan Natrelle style 68 High Profile 350 cc saline implants bilaterally. Although not indicated on the Operative Report there are handwritten notations on the implant label forms which suggest that each implant was inflated to 460 cc's. The entire surgery took 41 minutes. Sedation was provided by intravenously infusing Versed, Ketamine, Decadron, and Valium by a registered nurse.

51.     Ms. Kirk apparently returned for postoperative follow up with Mark A. Clayman on May 2, 2011. There is no patient questionnaire and no subjective assessment of the patient's condition. The only notation states, "ret check, small swelling, Pt with Ibuprofen first night possible swelling from sleep; no hematoma; ret 1 wk suture."

52.     Ms. Kirk returned again on May 6, 2011 complaining that it felt like her implant on her left was moving. She was also very concerned about the size of her implants and asked if the size would reduce when the swelling subsided. The only notation in her chart stated succinctly, "suture removed; ret. 1 mo."

53.     There is no indication of a physical examination by a physician nor any indication that the patient's questions or concerns were recognized or answered. In fact, Mark A. Clayman

told her that her complaints were normal and, when she complained about the size, he told her to, "get over it."

54.    On July 25, 2011, Ms. Kirk returned to consult with Mark A. Clayman. She was still concerned about her left implant. Her breast had a poor appearance and there were sounds made from the implant moving. It also looked like it had dropped. Mark A. Clayman performed a very brief examination and then concluded that it, "looks like you are deflating and you will need to have surgery again." Ms. Kirk was very upset and scared. She had a severe reaction, including continuing hallucinations, from sedation from the first surgery and was concerned that the scarring on her nipples would be even worse.

55.    On July 25, 2011, Ms. Kirk told Mark A. Clayman that at least he needed to make the breasts smaller this time. Mark A. Clayman merely recorded in the chart that, "Δ to left breast, defl. left, replace with smaller." There is a separate surgery cost estimate form provided to Belinda S. Kirk by Mark A. Clayman on July 25, 2011 that indicates that she had sustained a, "possible left deflation" and that a bilateral decrease of saline would be performed at no charge.

56.    Belinda S. Kirk returned for surgery again by Mark A. Clayman on August 3, 2011. On the patient questionnaire, Ms. Kirk listed her concerns and goals as follows:

- "left boob leak"
- "reduce size but stay away from sagging etc. wrinkling of implant. Size C 50 to 100 cc."

57.    There is no record that Mark A. Clayman discussed her goals or objectives prior to surgery. There is no indication that Mark A. Clayman ever provided appropriate counseling regarding the size or structure of her breasts, or the type of implants or size of implants to be used.

58.     On August 3, 2011, Mark A. Clayman had Ms. Kirk sign an Authorization for and Consent to Surgery or Therapeutic Procedures indicating the presence of a "left deflation" and the need for a bilateral implant replacement.  However, Ms. Kirk did not have an implant deflation.

59.     There appear to be two separate photographs taken of Ms. Kirk preoperatively. Neither photograph indicates the presence of an implant deflation.  Despite this, Mark A. Clayman listed the preoperative diagnosis in the Operative Report as a "left deflation."   Likewise, the preoperative diagnosis of "left deflation" is also listed in the OR Record.

60.     Mark A. Clayman first cut into the left breast on August 3, 2011 at the prior incision.  He dissected down to the implant capsule on the left and noted that the, "implant was found to have deflation (tissue/leak @ valve) and removed."  The OR Record also indicates: "leak/tissue @ valve left."  He then cut into the areola on the right and dissected down to the implant capsule.  Although the implant was found intact it was, nonetheless, removed.  Mark A. Clayman replaced the Allergan Natrelle style 68 High Profile 350 cc saline implants (which had been purportedly filled to 460 cc's) with Allergan Natrelle style 68 Moderate Profile 330 cc saline implants. The OR Record indicates on the labels of the implants that they were purportedly filled to 420 cc's each.

61.     The entire surgery took only 35 minutes.  Despite the extremely adverse experience suffered by the patient as a result of the last anesthetic regimen provided, Mark A. Clayman had the same anesthetic regimen used this time.  The patient received Valium, Decadron, Ketamine, and Versed administered by a registered nurse intravenously.  Again, the patient suffered from extreme hallucinations during the surgery and thereafter.

62.     Mark A. Clayman reported the left implant to be defective to Allergan prior to the surgery, without any actual evidence of defect and before he had the opportunity to inspect the

implant intraoperatively.[3]   Mark A. Clayman had Belinda S. Kirk sign the claim form before the
surgery was performed, so that Mark A. Clayman could be paid.  Mark A. Clayman subsequently
filed a warranty claim to Allergan for the left implant that he removed on August 3, 2011.  In the
paperwork he completed and sent to Allergan, Mark A. Clayman reported that there was a "[h]ole
in valve" and/or "[p]articles in valve." [4]     After examining the returned left implant, Allergan
documented in a *Laboratory Analysis* report that there were no findings to substantiate a
spontaneous saline implant deflation.  Specifically, the Laboratory Analysis found,

> White particles were observed on the inner and outer surfaces of the
> implant.  Brown particles were observed in the fill channel.  The particles
> were irremovable from the fill channel.

Virtually the identical findings were made by Allergan with regard to the other implant.  Despite
this, Allergan paid Mark A. Clayman and Clayman PA the sum of $1,200 for the surgery of August
3, 2011.

63.     Belinda Kirk returned for postoperative follow up on August 10, 2011, a week later.
Ms. Kirk was extremely upset about the severe scarring on her nipples.  She also complained that
her breasts were too tight and felt like they would explode.  It felt to Ms. Kirk that the implants
overfilled.  Although they were smaller, they felt like hard balls on her chest.  Mark A. Clayman
appeared not to care about her scars and tried to convince her that it was not a big deal and he did
all he could with what he had to work with.  Mark A. Clayman's only notation from the visit was,
"sutures removed, looks good.  ret 1 mo."  Ms. Kirk's complaints and concerns were simply
disregarded.

---

[3] The Returned Goods Authorization (RGA) Checklist for Saline Devices (the claim form) was
dated August 2, 2011, the day before surgery and received in Mark A. Clayman's office via
facsimile on that same day.
[4] These were the same defects Loren Z. Clayman reported in virtually every warranty claim
submitted to Allergan.

64.     After August 10, 2011, Ms. Kirk did not return to Clayman, P.A. or Mark A. Clayman.  After two surgeries at the hands of Mark A. Clayman, Ms. Kirk's implants remained extremely hard and painful.  She had significant scarring and tissue damage.  The implants demonstrated a poor aesthetic appearance.

65.     Because of the problem with her breasts and that she was still far larger than she desired to be, Ms. Belinda Kirk sought another plastic surgery.  On March 23, 2012, Ms. Kirk had her Allergan Natrelle saline implants placed by Mark A. Clayman removed by another surgeon. The amount of saline measured from the removed implant was 560 cc's.  Silicone breast implants were then inserted.

## COUNT I – CLAYMAN AND ALLERGAN'S CONSPIRACY TO COMMIT FRAUD AND/OR BREACH OF FIDUCIARY DUTY

66.     Ms. Kirk re-alleges and incorporates by reference paragraphs 1 through 65.

67.     On or before August 20, 2009, Loren Z. Clayman and/or Clayman PA entered into an agreement with Allergan to commit fraud and/or breach of fiduciary duty.  Later on, after Mark A. Clayman came to work at Clayman PA, he too entered into the agreement with Allergan to commit fraud and/or breach of fiduciary duty.

68.     Throughout the care and treatment of Ms. Kirk, Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA breached his/their fiduciary duty to Ms. Kirk by:

(a).     Recommending or insisting on Allergan Natrelle saline implants based on his/their direct financial motivation rather than making appropriate recommendations based on the best interest of the patient;

14

(b).     In relation to the August 3, 2011 surgery, claiming that Ms. Kirk's breast implant had deflated when in fact it had not;

(c).     Operating on Ms. Kirk based on an alleged implant deflation/rupture, which placed her at an increased risk for surgical and anesthetic complications, yet simply repeating the same procedure that was previously performed;

(d).     Not performing the surgery that Ms. Kirk's physical condition actually required, in favor of surgeries that took less time and skill, to allow for the removal and replacement of Allergan Natrelle saline implants; and/or

(e).     Operating on Ms. Kirk for an alleged implant deflation so that Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA could recover surgical fees from Allergan.

69.     On one or more of the below occasions, Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA made the following false statements or representations, which were intended to conceal his/their inability to perform the breast procedures competently and within the standard of care, and were also intended to conceal his/their financial motivation in connection with removal and replacement of Allergan Natrelle saline implants, and these statements did in fact mislead Ms. Kirk and/or caused her to respond in the following ways to her detriment:

(a).     On or about July 25, 2011, at Clayman PA's office, Mark A. Clayman told Ms. Kirk that her left breast implant had a leak, rupture, and/or deflation and that she needed to have it replaced. These statements were false, but they caused Ms. Kirk to agree to have another surgery by Mark A. Clayman and/or Clayman PA, to not seek a second opinion with another plastic surgeon, and/or to not consult with an attorney about a potential medical negligence claim;

15

(b).    In a surgical estimate prepared on July 25, 2011, at Clayman PA's office, Mark A. Clayman represented to Ms. Kirk that she had a "possible left deflation" and that both implants needed to be replaced.  In fact, Ms. Kirk did not have a left implant deflation, rupture, or leak, and Ms. Kirk did not need to have her implant(s) replaced.  These statements were false, but they caused Ms. Kirk to agree to have another surgery by Mark A. Clayman and/or Clayman, PA, and not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim;

(c).    In the informed consent dated August 3, 2011, Mark A. Clayman represented to Ms. Kirk that her left breast implant was deflated and needed to be replaced. In fact, Ms. Kirk did not have a deflation, rupture, or leak of her left implant, and Ms. Kirk did not need to have her implant(s) replaced.  These statements were false, but they caused her to agree to have another surgery by Mark A. Clayman and/or Clayman, PA instead of a different plastic surgeon.  As a result, Ms. Kirk did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim;

(d).    In the Operative Report and OR Record dated August 3, 2011, Mark A. Clayman represented to Ms. Kirk that her left breast implant was deflated and needed to be replaced. In fact, Ms. Kirk did not have a deflation, rupture, or leak of her left implant, and Ms. Kirk did not need to have her implant(s) replaced.  These statements were false, but they caused her to agree to have another surgery by Mark A. Clayman instead of a different plastic surgeon.  As a result, Ms. Kirk did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim;

(e).    On or about August 3, 2011, at Clayman PA, Mark A. Clayman and/or

16

Clayman PA made a warranty claim to Allergan in which he represented to Allergan, Ms. Kirk, and/or others that she had a leak, rupture, and/or deflation at her left breast implant, and that she needed to have it replaced as a result. These statements were false, but they caused Ms. Kirk to agree to have another surgery by Mark A. Clayman and/or Clayman P.A., to not seek a second opinion with another plastic surgeon, and/or to not consult with an attorney about a potential medical negligence claim.

70.     Allergan, through its employees or agents, knew that Mark A. Clayman, Mark A. Clayman, and/or Clayman PA, was committing fraud upon Ms. Kirk, and/or breaching a fiduciary duty owed to Ms. Kirk, due to the following:

(a).     Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants;

(b).     The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants;

(c).     Allergan did not have a Laboratory Analysis that supported paying the warranty claim of Mark A. Clayman and/or Clayman PA in relation to the left breast implant removed by Mark A. Clayman and/or Clayman PA from Ms. Kirk on August 3, 2011.

71.     Allergan committed one or more of the following overt acts in furtherance of the conspiracy to commit fraud and/or breach of fiduciary duty:

(a).    Continuing to sell Mark A. Clayman and/or Clayman PA saline breast implants until August 20, 2009;

(b).    Failing to report Mark A. Clayman and/or Clayman PA to the appropriate authorities before August 20, 2009;

(c).    Continuing to sell Mark A. Clayman and/or Clayman PA saline breast implants after August 20, 2009;

(d).    Failing to report Mark A. Clayman and/or Clayman PA to the appropriate authorities after August 20, 2009;

(e).    Paying the warranty claim of Mark A. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left saline filled breast implant that Mark A. Clayman placed into Ms. Kirk on April 29, 2011, and which Mark A. Clayman surgically removed on August 3, 2011;

(f).    Continuing to sell Mark A. Clayman and/or Clayman, PA saline breast implants after August 3, 2011;

(g).    Failing to report Mark A. Clayman and/or Clayman PA to the appropriate authorities after August 3, 2011.

72.    As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Mark A. Clayman, Mark A. Clayman, and/or Clayman PA, and also by Allergan, Ms. Kirk suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

73.     Furthermore, as a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, and also by Allergan, Ms. Kirk has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **BELINDA S. KIRK**, demands judgment for damages against the Defendants, **ALLERGAN SALES, LLC**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

### COUNT II – ALLERGAN AIDING AND ABETTING FRAUD AND/OR BREACH OF FIDUCIARY DUTY

74.     Ms. Kirk re-alleges and incorporates by reference paragraphs 1 through 65, 68 and 69.

75.     Allergan, through its employees or agents, knew that Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, was committing fraud upon Ms. Kirk, and/or breaching a fiduciary duty owed to Ms. Kirk, due to the following:

(a).     Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants;

(b).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants;

(c).    Allergan did not have a Laboratory Analysis that supported paying the warranty claim of Loren Z. Clayman and/or Clayman PA in relation to the left breast implant removed by Loren Z. Clayman and/or Clayman PA from Ms. Kirk on August 3, 2011.

76.    Despite the aforesaid knowledge of Allergan through its employees or agents, Allergan provided substantial assistance to Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA in committing fraud against Ms. Kirk, and/or breaching a fiduciary duty owed to Ms. Kirk, in one or more of the following ways:

(a).    Continuing to sell Mark A. Clayman and/or Clayman PA saline breast implants until August 20, 2009;

(b).    Failing to report Mark A. Clayman and/or Clayman PA to the appropriate authorities before August 20, 2009;

(c).    Continuing to sell Mark A. Clayman and/or Clayman PA saline breast implants after August 20, 2009;

(d).    Failing to report Mark A. Clayman and/or Clayman PA to the appropriate authorities after August 20, 2009;

(e).    Paying the warranty claim of Mark A. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left saline filled breast implant that Mark A. Clayman placed into Ms. Kirk on April 29, 2011, and which Mark A. Clayman surgically removed on August 3, 2011;

(f).     Continuing to sell Mark A. Clayman and/or Clayman, PA saline breast implants after August 3, 2011;

(g).     Failing to report Mark A. Clayman and/or Clayman PA to the appropriate authorities after August 3, 2011.

77.     As a direct and proximate result of the substantial assistance provided by Allergan to Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, Ms. Kirk suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

78.     Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan to Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, Ms. Kirk has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **BELINDA S. KIRK**, demands judgment for damages against the Defendants, **ALLERGAN SALES, LLC,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:     (904) 632-2424
Facsimile:     (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: jfleury@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiff